JUDGE MARRERO

11 CV 3618

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                   Plaintiff,<br><br>v.<br><br>DONALD L. JOHNSON,<br><br>                   Defendant,<br>and<br><br>DALILA LOPEZ,<br><br>                   Relief Defendant. | No.<br><br>ECF Case<br><br>COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

RECEIVED MAY 2011 U.S.D.C. S.D.N.Y. CASHIERS

The Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.      This case concerns serial insider trading by Donald L. Johnson ("Johnson"), a former employee of The NASDAQ Stock Market ("Nasdaq"). This insider trading took place over a three-year period from 2006 to 2009.

2.      Through his positions at Nasdaq, Johnson routinely received or had access to news of impending material corporate events prior to the news being publicly disseminated. This information related to changes in corporate leadership, earnings reports and forecast announcements, and regulatory approvals of new pharmaceutical products, among other examples.

3.      Over a three-year period, from August 2006 through July 2009, Johnson traded in advance of nine announcements of material nonpublic information involving Nasdaq-listed

companies. Johnson concealed his illicit trading by using an online brokerage account held in the name of his wife, Dalila Lopez (the "Lopez account"), that Johnson did not disclose to Nasdaq in violation of Nasdaq policy. Johnson frequently placed the orders for his illegal trades from his office computer at Nasdaq's offices in New York.

4. Johnson took advantage of both favorable and unfavorable information that was entrusted to him in confidence by Nasdaq and its listed company clients, shorting stocks on several occasions and establishing long positions in other instances, altogether reaping illegal profits in excess of $755,000.

5. Johnson's trading violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder. The Commission requests that this Court permanently enjoin Johnson from violating the aforesaid statutory provision and rule, order disgorgement of illegal trading profits with prejudgment interest thereon, and impose civil penalties. In addition, as to Relief Defendant Lopez, the Commission seeks disgorgement of all proceeds from the alleged insider trading that are in her possession, custody, or control, plus prejudgment interest thereon.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].

7. Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain acts and transactions constituting the violations occurred in this district. Many of Johnson's illegal trades were placed online from his work computer, located in Nasdaq's Manhattan offices.

8. Johnson, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in the complaint.

## DEFENDANT

9. Donald L. Johnson, age 56, currently resides in Ashburn, Virginia and worked in various positions for the NASD and Nasdaq for twenty years. Johnson voluntarily retired from Nasdaq in September 2009.

## RELIEF DEFENDANT

10. Dalila Lopez, age 54, currently resides in Ashburn, Virginia and is a registered nurse. Lopez is married to Donald L. Johnson. All of Johnson's illegal trading during the relevant period was conducted online using Lopez's brokerage account and Lopez received proceeds of the illegal trading described herein.

## FACTS

### I. Johnson's Role at Nasdaq

11. At all relevant times, Johnson was an employee of Nasdaq. From at least January 2000 until October 2006, Johnson worked in Nasdaq's Corporate Client Group ("CCG"), which seeks to attract and retain issuers, and provides investor relations services to Nasdaq-listed companies. In October 2006, Johnson transferred to the Market Intelligence Desk ("MID"), a specialized department within the CCG. The MID provides issuers with general market updates, overviews of their company's sector, and commentary regarding the factors influencing day-to-day trading activity in their stock.

12. In both positions, Johnson had frequent and significant interactions with senior executives of listed issuers, including CEOs, CFOs, and investor relations officers at each of his

3

assigned companies. By virtue of Johnson's employment at Nasdaq, Johnson's contacts shared highly confidential information with him regarding impending announcements that could affect trading in their companies' stocks. The corporate executives who shared information with Johnson did so based on the understanding that, by virtue of Johnson's position at Nasdaq, any material nonpublic information that they shared with him would be kept confidential and that Johnson would not use the information for his personal benefit, such as by insider trading. In at least one instance, Johnson specifically assured a corporate official that she could share material nonpublic information with him because, as an employee of Nasdaq, he would hold such information in confidence.

13. Johnson owed a duty of trust and confidence to his employer, which included (a) maintaining the confidentiality of material nonpublic information he learned during the course of his employment, including from clients, potential clients, external and/or internal sources; and (b) not misappropriating or using such material nonpublic information for his personal benefit, such as through insider stock trading.

14. Pursuant to the duty of trust and confidence that Johnson owed to Nasdaq as an employee of Nasdaq, and as an express condition of his employment by Nasdaq, Johnson was required to comply with its policies, including Nasdaq's insider trading policy ("Nasdaq policy"). That policy stated:

> No employee of NASDAQ OMX or any subsidiary of NASDAQ OMX collectively, "NASDAQ OMX Personnel") who is aware of material nonpublic information relating to NASDAQ OMX may buy or sell NASDAQ OMX securities or give, communicate, or in any other way convey such information to another person. <u>This Policy is applicable to material nonpublic information obtained in the course of employment about any</u>

4

<u>other company, including NASDAQ OMX's listed companies, prospective listed companies, members, collaborators, customers or suppliers. Any such nonpublic information obtained by NASDAQ OMX Personnel that relates to a company other than NASDAQ OMX should be treated as NASDAQ OMX information.</u> (Emphases added.)

Johnson periodically certified that he had read and accepted Nasdaq's policies.

15.     Nasdaq also required its employees to disclose all securities accounts and holdings in which they maintained control, effected transactions, or had a financial interest.

16.     In violation of Nasdaq's policy, Johnson never disclosed the existence of his wife's brokerage account to his employer, even though he was solely responsible for effecting trades in that account. Moreover, he periodically certified falsely to Nasdaq that he had disclosed all securities accounts in which he maintained control, may effect transactions, or had a financial interest.

## II.     Johnson's Insider Trading

### A.     Digene Corporation -- Trading Prior to Announcement of Resignation of Issuer's Co-Founder, President, and Chief Financial Officer

17.     At 7:00 a.m. on August 23, 2006, Digene Corporation ("DIGE") announced that the company's co-founder, who also served as its president, chief operating officer, chief financial officer, and as a director, was resigning. DIGE also announced that the company's senior vice president of finance and information systems ("SVP") would take over the role of CFO. Following the public announcement of the management changes, the price of DIGE stock fell by $4.75 per share, a drop of ten percent.

18.     On or about August 18, 2006, Johnson and several of his Nasdaq colleagues met with DIGE's SVP. At that time, the SVP told Johnson and his colleagues about the president's

5

resignation, the SVP's promotion to CFO, and the impending public announcement. This information was nonpublic and highly confidential to DIGE.

19. On August 22, 2006, Johnson sold short 9,900 shares of DIGE's stock in the Lopez account.

20. After the public announcement, on August 23, Johnson covered his entire short position, purchasing 9,900 shares of DIGE. Johnson's illicit profits from this trade totaled approximately $34,000.

B. **Central Garden and Pet Co. – Trading Prior to Quarterly Earnings Release**

21. In its fourth quarter earnings report, released at 4:01 p.m. on December 7, 2006, Central Garden and Pet Company ("CENT") announced that earnings per share would be in the range between $3.00 to $3.10 per share, which was well below most analysts' earnings estimates of $3.38 per share. In trading on the following day, the price of CENT stock fell by $1.55 per share, a decline of approximately nine percent.

22. On December 5 and 6, 2006, immediately prior to the release of the company's earnings, Johnson communicated by telephone and by email with an investor relations officer at CENT, and became aware that the company's 2007 earnings forecast would not meet analysts' estimates.

23. After he learned the material nonpublic information concerning CENT's impending earnings forecast, Johnson sold short 10,000 shares of CENT stock in the Lopez account prior to the market close on December 7, 2006. This order was placed from Johnson's computer at Nasdaq.

24. Later on December 7, after CENT had issued the press release announcing its 2007 earnings forecast, Johnson covered his short position in aftermarket trading. Both the short

6

sale order and the covering purchases were placed from Johnson's work computer at Nasdaq. Johnson's illicit profits from this trading totaled approximately $58,000.

### C. Pharmaceutical Product Development, Inc. I – Trading Prior to Quarterly Earnings Release

25.     At 4:30 p.m. on July 17, 2007, Pharmaceutical Product Development, Inc. ("PPDI") released its second quarter financial results. The company stated in its announcement that it was raising its research and development expenses and reducing its current year earnings per share guidance by almost ten percent.

26.     From July 12 to July 17, before the press release was issued, Johnson spoke several times with PPDI's vice president of finance. In the course of these communications, Johnson became aware that PPDI would be lowering its earnings guidance. The PPDI officer also discussed with Johnson whether Nasdaq would halt after-hours trading in PPDI's stock after the lowered earnings guidance had been publicly announced.

27.     Beginning at 3:52 p.m. on July 17, just thirty-eight minutes prior to the issuance of PPDI's earnings release, Johnson sold short 22,100 shares of PPDI stock in the Lopez account. He placed the short sale order from his Nasdaq computer.

28.     After the close of the market on July 17, but prior to the issuance of the release, Nasdaq temporarily halted after-hours trading in PPDI's stock.

29.     When trading in PPDI's stock was resumed later that day, Johnson began covering his short position. Johnson reaped approximately $100,000 in illicit profits from this trade.

**D. United Therapeutics Corporation I – Trading Prior to Public Announcement of Successful Drug Trial Results**

30.   At 4:30 a.m. on November 1, 2007, United Therapeutics Corp. ("UTHR") announced the successful completion of a trial for its drug Viveta (later renamed "Tyvaso"), stating that the trial "robustly met its primary endpoint."

31.   On or about October 30, 2007, Johnson spoke by telephone with senior executives at UTHR, including the chief financial officer and general counsel of UTHR. In the course of those communications, Johnson became aware of the successful Viveta trial results. At the time of those communications, the information regarding the Viveta trial results was nonpublic and highly confidential.

32.   On October 31, 2007, after learning of the Viveta trial results, Johnson purchased 10,000 shares of UTHR stock in the Lopez account.

33.   On the morning of November 1, after UTHR had issued its press release publicly announcing the successful trial results, Johnson began selling the 10,000 shares of UTHR stock that he had purchased on the day before. He placed the sell orders online, from his office computer at Nasdaq. Johnson obtained illicit profits of approximately $175,000 from his trading in UTHR stock.

**E. Energy Conversion Devices – Trading Prior to Quarterly Earnings Release**

34.   In its third quarter 2008 earnings report, released at 7:01 a.m. on May 8, 2008, Energy Conversion Devices ("ENER") announced a profit of $0.25 per share. Many analysts had predicted that the company would report a slight loss for the quarter. ENER's press release announcing the quarterly results stated that the company had "reached profitability" and that this was "a key milestone in [the] company's history." Following the announcement, in trading on

8

May 8, the price of ENER stock surged by $15.10 per share, an increase of approximately forty-three percent.

35. On or about May 6, 2008, Johnson had spoken by telephone with an investor relations officer at ENER and had become aware of ENER's nonpublic quarterly results.

36. On the following day, May 7, 2008, Johnson purchased a total of 13,021 shares of ENER in the Lopez account.

37. On May 8, 2008, after ENER had publicly disclosed its quarterly earnings, Johnson sold all 13,021 ENER shares that he had bought on the prior day. Both the purchase and sale orders were placed from Johnson's Nasdaq work computer. Johnson's illicit profits from this trading totaled approximately $114,000.

F. **IDEXX Laboratories, Inc. – Trading Prior to Quarterly Earnings Release**

38. IDEXX Laboratories, Inc. ("IDXX") publicly disclosed its 2008 third quarter results in a press release that was issued at 7:00 a.m. on October 24, 2008. In its press release, the company announced diluted earnings per share in excess of analyst estimates, but lowered its sales forecast for 2008. The price of IDXX's stock dropped fifteen percent following the announcement.

39. On October 22, 2008, an investor relations specialist at IDXX called Johnson to ask him for "color" regarding the heavy trading she observed in IDXX's stock. During that conversation, Johnson asked her to share the pending earnings results with him so that he could provide her with better trading analysis. Johnson also assured her that, because of his position at Nasdaq, he could not use the information in any improper way. The investor relations specialist then told Johnson that while the company's quarterly earnings would "beat the Street," it would be lowering its sales forecast.

40.     The next day, on October 23, 2008, Johnson sold short 15,500 shares of IDXX stock in the Lopez account.

41.     The following morning, after IDXX had issued its earnings press release, Johnson covered his short position, purchasing 15,500 IDXX shares. In total, Johnson profited by approximately $99,000 from this trade.

### G. Pharmaceutical Product Development, Inc. II -- Trading Prior to the Public Announcement that Company Would be Added to the NASDAQ-100 Index

42.     On Friday, December 12, 2008, at approximately 8:05 p.m., Nasdaq announced changes to the composition of the NASDAQ-100 Index, including the addition of PPDI to the Index.

43.     On or about December 10, 2008, an individual at Nasdaq sent an internal memorandum to Johnson by email, informing him that three of his assigned companies were being added to the Index. One of the companies identified in that memorandum was PPDI. The memorandum stated, "Remember that this is material non-public information for NASDAQ employees and the company." The memorandum also contained the following bold-faced warning on its first page:

> **NOTE: THIS INFORMATION IS STRICTLY CONFIDENTIAL, NOT FOR PUBLIC OR PRIVATE DISSEMINATION OR DISCUSSION AND SHOULD BE TREATED AS NEED TO KNOW ONLY. * * * IT IS TO BE USED EXCLUSIVELY FOR THE PURPOSE OF NECESSARY PREPARATIONS IN CONNECTION WITH THE ANNOUNCEMENT OF THE RANKING OF SECURITIES IN THE NASDAQ-100 INDEX. THE NUMBER AND IDENTITY OF THE COMPANIES SLATED FOR ADDITION OR REMOVAL FROM THE INDEX IS STRICTLY CONFIDENTIAL AND NON-PUBLIC INFORMATION UNTIL AN OFFICIAL NASDAQ**

ANNOUNCEMENT IS MADE ON FRIDAY, DECEMBER 12, 2008. * * * FAILURE TO STRICTLY ADHERE TO THE CONFIDENTIALITY REQUIREMENTS MAY CONSTITUTE A VIOLATION OF THE FEDERAL SECURITIES LAWS AND THE NASDAQ EMPLOYEE CODE OF CONDUCT.

44.   On same day, on December 10, PPDI's director of investor relations, sent Johnson an email with a copy of PPDI's draft press release announcing the company's addition to the Index.

45.   On December 12, 2008, shortly before the market close, Johnson purchased 23,000 shares of PPDI stock in the Lopez account, placing the order from his computer at Nasdaq.

46.   On the following Tuesday, December 16, 2008, Johnson sold all 23,000 PPDI shares, again placing the order from his Nasdaq computer. Johnson's illicit profits from this trade totaled approximately $5,300.

### H. Pharmaceutical Product Development, Inc. III -- Trading Prior to Quarterly Earnings Release

47.   PPDI released its financial results for the first quarter of 2009 at approximately 7:45 p.m. on April 21, 2009. In its press release, the company announced that it was lowering its earnings forecast for the year.

48.   On April 21, 2009, PPDI's investor relations officer called Johnson to consult him regarding the upcoming quarterly earnings release. During that conversation, Johnson became aware that, in the release, the company would lower its earnings forecast for the year.

49.   Shortly after speaking with the PPDI officer on April 21, 2009, and before the market close, Johnson sold short 20,000 shares of PPDI's stock in the Lopez account. The sell order was entered from Johnson's work computer at Nasdaq.

50.     The next morning, PPDI stock opened at $17.65 per share, a decline of $3.11, or approximately fifteen percent from the prior day's closing price. Beginning at 9:30 a.m., Johnson covered his entire short position. The buy order was also entered from his computer at Nasdaq. As a result of this trade, Johnson reaped illicit profits of approximately $59,000.

### I. United Therapeutics Corporation II – Trading Prior to the Public Announcement of Regulatory Drug Approval

51.     At approximately 11:36 a.m. on July 30, 2009, UTHR received an email from the U.S. Food and Drug Administration ("FDA") containing a letter granting approval for the use of UTHR's drug, Tyvaso, for the treatment of pulmonary arterial hypertension.

52.     Minutes later, the general counsel of UTHR forwarded the email, along with the attached approval letter, to Johnson at Nasdaq. Prior to this, both UTHR's chief financial officer and the general counsel had alerted Johnson that they anticipated a decision from the FDA shortly and sought his advice on how best to release the information publicly if the approval was granted during a trading day when the securities markets were open.

53.     Four minutes after Johnson received the approval letter by email from UTHR's general counsel, Johnson entered an order to purchase 11,500 shares of UTHR stock using the Lopez account. This order was entered from the computer at Johnson's workstation at Nasdaq's offices in New York.

54.     At 1:07 p.m. on July 30, ninety-one minutes after receiving the initial email from the FDA, UTHR issued a press release announcing the Tyvaso approval. The price of UTHR's stock surged by almost ten dollars in trading after the announcement and closed nearly twelve percent higher than the prior day's closing price.

55.     Approximately five minutes after UTHR had publicly announced the FDA approval, Johnson entered an order to sell the 11,500 shares of UTHR stock that he had

purchased in the Lopez account approximately one hour earlier. The sell order also was placed from his work computer at Nasdaq. Johnson reaped illicit profits of approximately $111,000 from this trade.

56. The nonpublic information that Johnson learned regarding each of the aforesaid public companies, as described in paragraphs 17 through 55, above, was material and highly confidential, and subject to the Nasdaq policy, both at the time that Johnson became aware of such information, as well as at the time that he effected transactions in the securities of those companies.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] And Rule 10b-5 [17 C.F.R. § 240.10b-5]) Thereunder

57. Paragraphs 1 through 56 are re-alleged and incorporated herein by reference.

58. Johnson misappropriated material, nonpublic information from his employer, Nasdaq, and from Nasdaq's clients, on nine separate occasions over a three-year period. In each instance, in breach of a duty of trust and confidence that he owed to his employer, he traded on the basis of the misappropriated information, reaping illicit profits in excess of $755,000. Johnson knew, or was reckless in not knowing, that the information provided to him by Nasdaq's clients was material, nonpublic information and that his trading breached the duty of trust and confidence that he owed to his employer.

59. By engaging in the conduct described above, Johnson, knowingly or recklessly, directly or indirectly (a) employed a device, scheme, or artifice to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a

fraud or deceit upon other persons, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange.

60. By reason of the foregoing, Johnson violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and is likely to commit such violations in the future unless enjoined from doing so.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment of Dalila Lopez

61. Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

62. All of Johnson's illegal trades were executed in Lopez's online brokerage account. Lopez therefore has no legitimate claim to those funds, and has thus been unjustly enriched under circumstances in which it is not just, equitable, or conscionable for her to retain such profits.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment:

A. Permanently enjoining Johnson from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

B. Ordering Johnson and Lopez to disgorge, jointly and severally, all illicit trading profits or other ill-gotten gains obtained as a result of the conduct alleged in this complaint, together with prejudgment interest on all such amounts;

C. Ordering Johnson to pay a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

D.  Ordering Johnson to submit to the Court and to Plaintiff's counsel a sworn accounting, under penalty of perjury, of all of the proceeds from the securities transactions described herein; and

E.  Granting such other relief as the Court deems just and appropriate.

Dated: May 26, 2011

Respectfully submitted,

Paul W. Kisslinger (PK0764)
100 F Street, N.E.
Washington, DC 20549-4010A
(202) 551-4427
(202) 772-9246 (fax)
Email: kisslingerp@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission

Of Counsel:
Antonia Chion
Yuri B. Zelinsky
Anthony J. Winter